IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12-cv-00274-GCM

| | |
|---|---|
| STEVEN GAUTHIER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| THE SHAW GROUP, INC., SHAW ) | |
| NUCLEAR SERVICES, INC., SHAW ) | |
| POWER, INC., and DOES 1 THROUGH 20, ) | |
| ) | |
| Defendants, ) | |
| ) | |

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 24); Plaintiff's Response in Opposition (Doc. No. 26); and Defendants' Reply (Doc. No. 27). For the reasons set forth below, the Defendants' motion is GRANTED.

## I. FACTUAL BACKGROUND

Plaintiff, Steven Gauthier, was a Quality Engineering Supervisor for The Shaw Group, Inc. (the "Shaw Group") at a nuclear construction site in South Carolina from 2010 until his termination in May of 2011. (Doc. No. 19, Amended Compl. ¶ 3.) The Shaw Group is a licensee, contractor, and/or subcontractor of a licensee of the Nuclear Regulatory Commission ("NRC" or the "Commission"). (*Id.* at ¶ 5.) Defendant Shaw Power, Inc. ("Shaw Power") is a wholly owned subsidiary of the Shaw Group. (*Id.* at ¶ 6.) Defendant Shaw Nuclear Services Inc. ("Shaw Nuclear") is a wholly owned subsidiary of the Shaw Group and Shaw Power. (*Id.* at ¶ 7.) Defendants Shaw Nuclear, Shaw Power, and the Shaw Group share a Louisiana office at 4171

Essen Lane in Baton Rouge. (*Id.* at ¶¶ 5-7.) The twenty unidentified individual defendants (the "Individual Defendants") are "in some manner responsible for," and were the proximate cause of Plaintiff's injuries. (*Id.* at ¶ 8.)

Plaintiff was part of a team performing an audit of a nuclear steel supplier, Gerdau Ameristeel, and discovered that Gerdau Ameristeel shipped defective steel to two nuclear reactor sites and two fuel fabrication facilities. (Doc. No. 19, Amended Compl. ¶ 19-20.) Plaintiff informed several Shaw Group directors and managers of the defective shipment and notified them that he would be required to place a "stop work" on Gerdau Ameristeel or report his concerns to the NRC. (*Id.* at ¶¶ 21-22.) The directors did not feel such notification was necessary. (*Id.* at ¶ 22.)

Plaintiff's direct supervisor, David Taggert, directed Plaintiff to inform personnel at two nuclear facilities that they had received nonconforming steel and to forward part of the Gerdau Ameristeel report to one of the fuel fabrication facilities. (*Id.* at ¶¶ 17, 23.) Plaintiff did so. (*Id.* at ¶ 23.) Plaintiff believed he was required by law to inform the fuel fabrication facility of the defective steel shipment. (*Id.*)

Plaintiff alleges that the Shaw Group tried to cover up the audit report by changing the audit report's conclusions from "ineffective" to "effective," and applying the lead auditor's signature to the document electronically after he refused to sign it. (Doc. No. 19, Amended Compl. ¶ 26.) The report was transmitted via email among the Shaw Group's management. (*Id.*) Plaintiff claims he "directly confronted his supervisor, David Taggert, and reported and voiced his displeasure at the fact that the audit report had been fraudulently altered." (*Id.*) Plaintiff was concerned that the Shaw Group was violating the Energy Reorganization Act ("ERA") and NRC regulations, and these potential violations created a financial risk for the company. (*Id.* at ¶ 27.)

Plaintiff contends that Shaw Group management harassed him as soon as he reported his concerns. (*Id.* at ¶ 28.) Specifically, the Shaw Group "tried to pressure [Plaintiff] . . . to accept the defective product," "forced [him] to constantly defend against verbal attacks on his credibility," "dismissed [Plaintiff's] reports as unimportant," and "routinely told [him that] he was wrong and that nothing would be done." (*Id.* at ¶ 29.) Finally, Plaintiff claims that Defendants "excluded [him] from audit meetings," "attempted to dissuade [him] from making further reports," and "limit[ed] communications to [him] regarding the Gerdau report and audit." (Doc. No. 19, Amended Compl. ¶¶ 30-31.)

Plaintiff was terminated on May 23, 2011, almost immediately after the Shaw Group's management learned that Plaintiff had sent the audit information to the fuel fabrication facility. (*Id.* at ¶ 32.) Plaintiff was escorted out of the building by a member of the Shaw Group's Human Resources Department, and was "paraded . . . in front of his co-workers as an example of what would happen should any other employees dare to question The Shaw Group's safety practices." (*Id.*) After his termination, Plaintiff reported his concerns to the NRC. (*Id.* at ¶ 33.)

Plaintiff filed this action in April 2012. Plaintiff subsequently filed an Amended Complaint on July 18, 2012 alleging claims under the Energy Reorganization Act (Count I), the Sarbanes-Oxley Act (Count II), and the Dodd-Frank Act (Count III), along with claims for negligent and intentional infliction of emotional distress (Counts IV, V, and VI). Now before the Court is Defendants' Federal Rule of Civil Procedure 12(b)(6) motion to dismiss Counts II through VI in their entirety and Count I as against Shaw Nuclear, Shaw Power, and the Individual Defendants.

3

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009). A complaint, therefore, must allege each necessary element of the claim. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 562 (2007). Determining whether a complaint meets this standard follows a "two-pronged approach." *Iqbal,* 556 U.S. at 679.

First, the court begins by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Moreover, a court should not assume the truth of "bald allegations" or legal conclusions. *Id.* at 678-681 (discussing that the Federal Rules of Civil Procedure "do not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

Once the court eliminates conclusory pleadings, the court determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Id.* at 679. The allegations must suffice to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. "[T]o survive a motion to dismiss, the complaint 'must state a plausible claim for relief' that 'permits the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010).

## III. DISCUSSION

### A. Count I: Energy Reogranization Act[1]

Under the ERA, "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee [engaged in protected activity]." 42 U.S.C. § 5851(a)(1). An "employer" is defined as:

> (A) a licensee of the Commission or of an agreement State under section 274 of the Atomic Energy Act of 1954 (42 U.S.C. 2021);
> (B) an applicant for a license from the Commission or such an agreement State;
> (C) a contractor or subcontractor of such a licensee or applicant;
> (D) a contractor or subcontractor of the Department of Energy that is indemnified by the Department under section 170 d of the Atomic Energy Act of 1954 (42 U.S.C. 2210 (d)), but such term shall not include any contractor or subcontractor covered by Executive Order No. 12344;
> (E) a contractor or subcontractor of the Commission;
> (F) the Commission; and
> (G) the Department of Energy.

42 U.S.C. § 5851(a)(2).

Here, Plaintiff does not allege that the Individual Defendants, Shaw Nuclear, or Shaw Power were his employer. Plaintiff does not allege that the Individual Defendants, Shaw Nuclear, or Shaw Power were licensees, contractors, or subcontractors of the Commission. Nor does Plaintiff allege that these Defendants fit into any of the other enumerated categories. Plaintiff argues that the Court should view his collective use of the term "Defendants" as creating the implication that Plaintiff was in fact employed by all Defendants. (Doc. No. 26, Opposition at 12-13.) The Court finds this argument unpersuasive, particularly in light of the clear and specific factual allegations regarding Plaintiff's employment with the Shaw Group.

---

[1] Defendants move to dismiss this claim only against Defendants Shaw Nuclear, Shaw Power, and the Individual Defendants. Plaintiff's ERA claim against the Shaw Group is not at issue here.

5

While Defendants have not moved to dismiss this claim against the Shaw Group, Plaintiff's factual allegations against the Shaw Group are illustrative of how to properly plead that a defendant is an employer under the ERA. Plaintiff pleads that he "worked as a Quality Engineering Supervisor for Defendant The Shaw Group, Inc." (Doc. No. 19, Amended Compl. ¶ 3.) Plaintiff also specifically alleges that "[t]he Shaw Group is a licensee, contractor and/or subcontractor of a licensee of the Nuclear Regulatory Commission." (*Id.* at ¶ 5.) For the purposes of a Rule 12(b)(6) motion, this is sufficient to bring the Shaw Group under the definition of "employer" established in Section 5851(a)(2) of the ERA. Plaintiff has made no such specific allegations against the other defendants, and cites no authority in support of the proposition that the collective use of the term "Defendants" is legally sufficient to satisfy their pleading requirement.

Plaintiff's alternative theory of relief against the Individual Defendants, Shaw Nuclear, and Shaw Power under the ERA is that all Defendants were in fact alter egos of the others.[2] Plaintiff bases this claim on his allegation that he "is informed and believes, . . . that, at all times material herein, each Defendant was completely dominated and controlled by his, her or its Co-Defendant and each was the alter ego of the other." (Doc. No. 19, Amended Compl. ¶ 10.) Plaintiff also alleges that "each of the Defendants was . . . working in concert with his, her or its Co-Defendants." (*Id.* at ¶ 9.) Such conclusory, unsupported allegations alone are insufficient to support an alter ego claim. The only concrete factual allegation Plaintiff puts forth in support of their alter ego claim is that all Defendants share a common office address. (*Id.* at ¶¶ 5-7.)

---

[2] Plaintiff raises an issue regarding the applicable law governing the alter ego determination. (Doc. No. 26, Opposition at 11.) The Court need not determine what law governs the determination because any possible applicable law utilizes similar factors. *Compare Town of Haynesville, Inc. v. Entergy Corp.*, 956 So.2d 192, 196 n.1 (La. App. 2007) (listing factors under Louisiana law), *with Richmond v. Indalex, Inc.*, 308 F. Supp. 2d 648, 656 (M.D.N.C. 2004) (listing relevant factors under North Carolina law), *and Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60, 65 (listing relevant factors under federal common law).

Plaintiff argues that the shared office address indicates that the Defendants were simply a façade for the Shaw Group. (Doc. No. 26, Opposition at 16.) Plaintiff cites two cases in support of this position, however a closer reading of the cases shows that factors other than the shared address factored significantly into the courts' decisions. In *Southern Capitol Enterprises, Inc. v. Conseco Services, L.L.C.*, 476 F. Supp. 2d 589 (M.D. La. 2007), the entities involved shared the exact same business function, had substantial overlap among officers and directors, used each other's supplies and equipment, and freely shared employees among the purportedly separate entities. *Id.* at 597. In *Green v. Champion Insurance Co.*, 577 So. 2d 249 (La. Ct. App. 1991), the entities involved had the same directors and officers, were financially dependent on each other, and intermingled their income and expenses in their accounting statements. *Id.* at 258-59. Plaintiff has made no such allegations here. The sole fact that Defendants shared a common address, along with conclusory allegations of control and concerted action, is insufficient to justify piercing the corporate veil.

For these reasons, Plaintiff has failed to state a claim as to Shaw Power, Shaw Nuclear, and the Individual Defendants under the ERA and the claim is dismissed as against those Defendants. The ERA claim against the Shaw Group remains intact.

### B. Count II: Sarbanes-Oxley Act

In order to state a prima facie case under Section 1514A of the Sarbanes-Oxley Act ("SOX"), a plaintiff's complaint must allege: (1) the employee engaged in a protected activity or conduct; (2) the employer knew or suspected, actually or constructively, that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action. 29 C.F.R. § 1980.104(b)(1) (2007).

7

As to the first element, that the employee engaged in a protected activity, the plaintiff "must show that he had both a subjective belief and an objectively reasonable belief that the conduct he complained of constituted a violation of relevant law." *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008) (citing *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008)) (internal quotations omitted). The relevant laws listed in Section 1415A are: "Section 1341 [relating to mail fraud], 1343 [relating to fraud by wire, television or radio], 1344 [regarding bank fraud], or 1348 [regarding securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1415A(a)(1).

There is a split of authority regarding the interpretation of this particular provision. *See Reyna v. ConAgra Foods, Inc.*, 506 F.Supp.2d 1363, 1381-82 (M.D.Ga. 2007) (compiling cases). Plaintiff argues that complaining of mail fraud, wire fraud, bank fraud, securities fraud, or violations of SEC regulations constitutes protected activity under the SOX even if the fraud does not specifically relate to a fraud upon shareholders. (Doc. No. 26, Opposition at 14.) Some courts, like *Reyna*, agree with Plaintiff's proposition. *Reyna*, 506 F.Supp.2d at 1382-83. Under this interpretation, only the final category of conduct, the violation of any provision of federal law, must relate to a fraud against shareholders. *Id.*

The Fourth Circuit, however, follows a different interpretation. "To be protected under Sarbanes-Oxley, an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud." *Livingston v. Wyeth Inc.*, No. 1:03CV00919, 2006 WL 2129794, at *10 (M.D.N.C. July 28, 2006), *aff'd*, 520 F.3d 344 (4th Cir. 2008). In affirming the district court's dismissal of the plaintiff's SOX claim, the Fourth Circuit Court noted several defects in plaintiff's claim, including that "there is no suggestion . . . that Wyeth or its employees had or

even intended to mislead *shareholders*, as necessary to support a reasonable belief that the securities laws had been or were being violated." *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 354 (4th Cir. 2008) (emphasis in original). In keeping with this precedent, the conduct complained of will only be relevant under Section 1415A(a)(1) if it relates to fraud against shareholders.

Applying this standard it becomes clear that Defendants' actions are not within the purview of Section 1415A. Even if Defendants' conduct constituted fraud, it was not of the kind contemplated by the SOX. Plaintiff alleges Defendants changed an audit report conclusion from "ineffective" to "effective," and applied the lead auditor's signature to the altered report. (Doc. No. 19, Amended Compl. ¶ 26.) The report related to an audit of a steel supplier, Gerdau Ameristeel which had discovered that the supplier had shipped defective steel to two nuclear reactor sites and two fuel fabrication facilities for use in safety-related applications. (*Id.* at ¶¶ 19, 20.) Any fraudulent modification of the safety-related report would not provide a basis for suit under Section 1415A because it in no way reflects attempts to defraud shareholders.

The reporting of safety concerns, even when falsification of documents is involved, is not SOX protected activity. In *Leak v. Dominion Resources Services*, Case No. 2006-SOX-12, 2006 WL 5676804 (U.S. Dept. of Labor SAROX May 12, 2006), the complainant was terminated after reporting his employer's possible violations of the Pipeline Security Improvement Act ("PSIA"). *Id.* at *1. PSIA was enacted in order to "improve the safety regulatory program at the Department of Transportation, increase levels of safety throughout our national pipeline system and in the communities through which pipelines run." *Id.* at *11. The complainant believed his employer had falsified and destroyed documents relating to PSIA violations. *Id.* at *9. In dismissing the complainant's SOX claims, the court held that "[f]alsification of documents that may or may not evidence a violation of PSIA is not a fraud on the shareholders in the sense of

9

what SOX was promulgated to protect [-] fraud pertaining to corporate accounting and financial practice." *Id.* As discussed above, Plaintiff here complained of document falsification relating to defective steel, an issue relating directly to safety, not finances or accounting.[3]

Furthermore, Plaintiff's Amended Complaint reflects that he held no objective or subjective belief that his employer's conduct related to a relevant securities violation as required under *Welsh*, 536 F.3d at 275. Plaintiff's concern was safety. Objectively, when reporting the alleged violation to others within the company Plaintiff recounted that he "had obtained information reasonably indicating that Gerdau Ameristeel failed to comply with the Atomic Energy Act of 1954 and/or the Energy Reorganization Act of 1974." (Doc. No. 19, Amended Compl. ¶ 21.) Plaintiff went on to report that "he was required by . . . the United States Nuclear Regulatory Commission to either place a 'stop work' on Gerdau Ameristeel or report the safety concern to the United States Nuclear Regulatory Commission." (*Id.*) These allegations illustrate that the concerns Plaintiff objectively communicated to his employer involved violations of nuclear safety regulations, not securities violations.

Subjectively, Plaintiff "was especially concerned about the dissemination of this fraudulent audit report and the probability that Defendants could be found guilty of fraud and failure to comply with the [ERA] and NRC regulations." (*Id.* at ¶ 26.) He also "believed that if Defendants were found guilty of fraud and of violating ERA and NRC regulations, Defendants would inevitably be cited by NRC and penalized by substantial fines." (*Id.* at ¶ 27.) This shows Plaintiff was subjectively concerned not with securities violations, but of lapses under nuclear

---

[3] Plaintiff also argues that the manipulation of the audit report and failure to monitor their steel suppliers constitutes fraud against shareholders because such violations of the ERA and NRC regulations could have a substantial financial impact on the company. (Doc. No. 26, Opposition at 16-18.) Therefore, Plaintiff argues disclosure of the violations would be required under 15 U.S.C. § 7241 as a material fact relating to finances. (*Id.*) Even if Defendant's behavior rose to the level of a material fact, as discussed below, there remains no indication that Plaintiff held the requisite objective and subjective belief that Defendants' behavior violated a relevant law when communicating his concerns to his employer.

safety regulations. Both Plaintiff's objective words and actions as well as his subjective beliefs reflect that he did not believe he was complaining of conduct that would constitute a fraud against Defendants' shareholders at the time he communicated his concerns to his employer. His complaints were clearly aimed at rectifying conduct that raised nuclear safety concerns and constituted possible violations of NRC regulations or the ERA.

Plaintiff failed to allege any conduct by Defendants relating to a fraud against shareholders. Additionally, Plaintiff has not alleged that he held a subjective or objective belief that Defendants' conduct violated a relevant law at the time he communicated his concerns. For these reasons, Plaintiff's Sarbanes-Oxley Act claim is dismissed.

### C. Count III: Dodd-Frank Act

Recently enacted as part of the Dodd-Frank Act, Section 21F of the Securities and Exchange Act of 1934 prohibits employers from taking any adverse employment actions against an employee who engages in "making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002." 15 U.S.C. § 78u-6(h)(1)(A)(iii). As discussed *supra*, Plaintiff's disclosures were not protected under the Sarbanes-Oxley Act. As a result, Plaintiff cannot state a claim under the Dodd-Frank Act, and the claim is dismissed.

### D. Counts IV and VI: Intentional Infliction of Emotional Distress

To successfully state a claim for Intentional Infliction of Emotional Distress (IIED) in North Carolina, a plaintiff must show: (1) extreme and outrageous conduct by the defendant, (2) which is intended to cause and does cause, (3) severe emotional distress to the plaintiff. *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Conduct is only considered extreme and outrageous when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized community." *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 493, 340 S.E.2d 116, 123 (1986). "Mere insults, indignities, and threats do not constitute extreme and outrageous conduct because plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind." *Laing v. Federal Express Corp.*, No. 3:10-CV-00242, 2011 WL 6072028, at *9 (W.D.N.C. Oct. 13, 2011) (internal citations and quotations omitted). "Courts are reluctant to find conduct arising from an employment context to be extreme and outrageous." *Id.*; *see also Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) ("it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of [IIED].") When North Carolina courts do find extreme and outrageous conduct in an employment context it typically "involve[s] sexual advances, obscene language, and inappropriate touching." *Bratcher v. Pharm. Prod. Dev., Inc.*, 545 F. Supp. 2d 533, 545 (E.D.N.C. 2008).

Here, Plaintiff alleges Defendants "retaliated against" him, and that he was "harassed." (Doc. No. 19, Amended Compl. ¶ 28.) Plaintiff claims he suffered "attacks on his credibility" and that his reports were dismissed as unimportant. (*Id.* at ¶ 29.) He adds that he was "excluded from audit meetings," and that Defendants limited his communication regarding the report and audit. (*Id.* at ¶¶ 30-31.) Plaintiff also alleges that after his termination he was "parad[ed] in front of his co-workers" as he was escorted out of the building by a human resources employee. (*Id.* at ¶ 32.) Behavior akin to that Plaintiff alleges is routinely found insufficient to support a claim for IIED in North Carolina. *See, e.g., Huggins v. N.C. Dep't of Admin.*, No. 5:10-CV-414-FL, 2011 WL 3917372, at *7 (E.D.N.C. Sept. 2, 2011) (dismissing IIED claim where plaintiff alleges defendant denied her job assignment, promotions, and other opportunities, set impossible

assignment deadlines, and reviewed her performance arbitrarily); *Pardasani v. Rack Room Shoes, Inc.*, 912 F. Supp. 187, 192 (M.D.N.C. 1996) (finding no extreme and outrageous conduct where plaintiff alleges defendant gave plaintiff poor performance evaluations, refused him promotions, excluded him from training, and eventually terminated him); and *Clark v. O'Rourke*, No. 3:10-CV-527-RJC-DCK, 2011 WL 1400429 at **1, 6 (W.D.N.C. Feb. 22, 2011) (granting motion to dismiss where plaintiff alleged defendant had him escorted from the building after terminating his employment contract).

Plaintiff argues that *Dixon v. Stuart*, 85 N.C. App. 338, 340, 354 S.E.2d 757, 759 (1987), supports the proposition that bare allegations of ridicule and harassment are sufficient to support a claim for IIED. (Doc. No. 26, Opposition at 26.) The Court finds this argument unpersuasive in light of the significant change in pleading requirements in the intervening 25 years since *Dixon* was decided. The Supreme Court has since held that a complaint must state specific facts that plausibly give rise to an entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Unsupported allegations like those in *Dixon* are no longer sufficient to survive a Rule 12(b)(6) motion to dismiss. As a result, Plaintiff's argument based on *Dixon* is unpersuasive.

Plaintiff's complaint contains two separate claims for IIED, however both appear to be based upon the same alleged conduct by the Defendants. (Doc. No. 19, Amended Compl. ¶¶ 59-63, 68-71.) Accordingly, because Plaintiff has failed to allege any actions by Defendants that rise to the requisite level of extreme and outrageous conduct, both Plaintiff's IIED claims are dismissed.

### E. Count V: Negligent Infliction of Emotional Distress

Under North Carolina law, in order to state a claim for negligent infliction of emotional distress (NIED) a plaintiff must allege: (1) the defendant negligently engaged in conduct, (2) it

was reasonably foreseeable that such conduct would cause the plaintiff sever emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress. *Johnson v. Ruark Obstetrics and Gynecology Associates, P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). "In a claim for NIED, a plaintiff cannot simply restate facts regarding intentional behavior that form the basis for a claim of IIED to form a claim for NIED." *Huggins v. N.C. Dept. of Admin.*, 5:10-CV-414-FL, 2011 WL 3917372, at *8 (Sept. 2, 2011). In fact, "[t]he law is clear . . . that inherently intentional conduct, such as discrimination, cannot support a claim for negligent infliction of emotional distress." *Springs v. Mayer Brown, LLP*, No. 3:09-cv-352-MR-DSC, 2009 WL 3461231, at *7 (W.D.N.C. Oct. 20, 2009). "Without question, basing a claim upon intentional conduct and simply labeling it as negligent is untenable as an attempt to state a cause of action for negligence." *Riepe v. Sartedt*, No. 5:09-cv-00104, 2010 WL 3326691, at *4 (W.D.N.C. Aug. 23, 2010).

Here, Plaintiff claims Defendants "were negligent in failing to take adequate measures to prevent and remedy the unlawful mistreatment of Plaintiff, including failing to correct the behaviors of those who sought to harass and retaliate against him for engaging in protected activity." (Doc. No. 19, Amended Compl. ¶ 65.) Plaintiff argues in his IIED claims that "Defendants' conduct . . . was extreme and outrageous and was done with the intent of causing Plaintiff to suffer emotional distress" (*Id.* at ¶ 60), and that "[t]he conduct by Defendants' managerial employees and agents was intended to cause . . . severe emotional distress." (*Id.* at ¶ 70.) In essence, Plaintiff argues that Defendants intentionally harassed and mistreated Plaintiff while at the same time negligently failing to prevent or correct the harassment. A similar argument was rejected by the court in *Riepe*, saying:

> [i]n Plaintiff's filings, she repeatedly asserts that Defendant Sarstedt adopted policies that discriminated against her because of her sex, concealed Defendant

14

Rumswinkel's behavior, and consciously chose to retain him rather than protect its female employees. An employer cannot actively engage in such a scheme of discrimination while simultaneously negligently failing to employ procedures to maintain a work place free of sexual harassment and discriminator conduct.

*Riepe*, 2010 WL 3326691 at *5 (internal quotations and citations omitted). Taking all the allegations as true and construing them in the light most favorable to Plaintiff, it appears that Plaintiff only alleged intentional behavior by Defendants.[4] Merely re-labeling the same conduct as negligent is insufficient to support a claim for NIED. Accordingly, Plaintiff's NIED claim is dismissed.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is **GRANTED**. Counts II through VI of Plaintiff's Amended Complaint are **DISMISSED** in their entirety. Count I is **DISMISSED** as against Defendants Shaw Nuclear, Shaw Power, and the Individual Defendants. Accordingly, the only matter still before the Court is Plaintiff's Energy Reorganization Act claim (Count I) against Defendant Shaw Group. The Shaw Group is the only remaining Defendant. All other Defendants are dismissed.

SO ORDERED. this 3rd day December, 2012.

*Graham C. Mullen*

---

[4] As discussed *supra*, Section III.D., the intentional behavior Plaintiff alleges still does not rise to the level of extreme and outrageous conduct such that it would support a claim for IIED.